UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MILLICENT BARRETT-BROWNING,
    *Plaintiff*,

    v.

DEPARTMENT OF CORRECTION, STATE
OF CONNECTICUT,
    *Defendant*.

No. 3:18-cv-01732 (JAM)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Millicent Barrett-Browning was employed as a correctional officer for the defendant Connecticut Department of Correction ("DOC"). She had a bladder dysfunction disability and claims that she was subject to a hostile work environment because of this disability and that the DOC failed to accommodate her disability. I will grant the DOC's motion for summary judgment on the ground that there is no genuine issue of fact to support Barrett-Browning's claims that occurred within the three-year statute of limitations period.

**BACKGROUND**

The DOC hired Barrett-Browning in August 2004 as a correctional officer. Doc. #54-1 at 2 (¶ 5). Beginning in 2006 she was assigned to work at the Hartford Correctional Center ("HCC"). *Ibid.* (¶ 6). This facility houses inmates primarily in four dormitories with populations of up to 120 inmates each. *Id.* at 2-3 (¶¶ 7-8).

Barrett-Browning suffers from a bladder dysfunction that requires her to use a restroom at regular intervals. *Id.* at 1 (¶ 2). In 2013, she provided a doctor's note stating that she needed "immediate access to a bathroom." *Id.* at 4 (¶ 12).

1

After returning from surgical procedures related to her bladder dysfunction in 2013 and 2014, Barrett-Browning discussed her condition with the warden and her female captain, *id.* at 5 (¶ 17), and each time they assigned her to work as a lobby control officer—a desk job that did not require inmate contact, Doc. #54-2 at 41. She states that this posting allowed her to freely use the restroom without asking to be relieved at her position by another person. Doc. #54-3 at 10, 13.

But Barrett-Browning was at times assigned to an inmate dormitory where inmates were not kept in locked cells, thereby requiring her constant vigilance. Doc. #54-1 at 3 (¶¶ 9-10). During those dormitory assignments, it was impossible for her to have immediate access to a restroom without compromising the safety and security of the facility. *Id.* at 5 (¶ 18), 7 (¶ 23); Doc. #54-2 at 44. She could not leave her dormitory post unless relieved by another officer. Doc. #54-1 at 6-8 (¶¶ 22, 24-25). During each eight-hour shift while working in one of the dormitories, Barrett-Browning was permitted to take at least three breaks when she could leave her post to use the restroom, to wear protective garments like incontinence pads, and to change her clothes if she soiled her pants as she did at least once in 2015 and again in 2016. *Id.* at 10-11 (¶¶ 32-36).

In March 2015, Barrett-Browning applied for a promotion to lieutenant after passing the required exam and with excellent performance evaluations. *Id.* at 11-12 (¶ 39). But Captain Timothy Newton advised Barrett-Browning one day in May 2015 that he would not be recommending her for promotion and in doing so he referenced the incontinence bag that Barrett-Browning wore, which was occasionally visible when her jacket was open. *Id.* at 12 (¶¶ 40-41). He also allegedly warned her that "[i]f [she] ruffle[s] [his] feathers, [he] will make

sure [she is] placed in a block or a dorm for the rest of [her] career," and "[she] will get nothing in this place." Doc. #54-2 at 89.

Barrett-Browning contacted her union representative about Captain Newton's statements, and the representative assured her that Captain Newton would change his recommendation and place her on the promotion list. Doc. #54-1 at 12 (¶ 44). Evidently very distressed by Captain Newton's remarks, Barrett-Browning also sent a text message to Lieutenant Dawn Hicks, who had been supportive of her promotion, stating that "[j]ust in case if anything happens and you don't see me at work tomorrow, just know that it's because of how he treated me in his office." *Id.* at 13 (¶¶ 45-46).

The following day Captain Newton told Barrett-Browning that he would now be recommending her for the promotion. *Ibid.* (¶ 47). That was the final time the two interacted. *Ibid.* (¶ 48). And there were no more references by any supervisor to Barrett-Browning about her bladder dysfunction condition. *Id.* at 12 (¶¶ 42-43).

Shortly thereafter, Barrett-Browning filed an incident report about Captain Newton's conduct with the Commissioner of the DOC. Doc. #54-3 at 8. She was also approached by Lieutenants Perez and Hicks, who told her to "[g]ive [them] all the pills [she is] taking" because "[they] hear [she is] going to kill [herself]." Doc. #54-2 at 58.

Barrett-Browning took the rest of the day off and met with Lieutenant Hicks who, possibly fearing her text message was a suicide threat, advised her that the warden felt she should contact the Employee Assistance Program. Doc. #54-1 at 13-14 (¶¶ 49-52). Lieutenant Hicks convinced Barrett-Browning to leave her home and come with her. Doc. #54-2 at 65-70. Unbeknownst to Barrett-Browning, Lieutenant Hicks took her to Manchester Memorial Hospital, *ibid.*, where she was placed on an involuntary hold until the next day, Doc. #54-1 at 14 (¶ 53).

3

After being told that she needed a completed fitness-for-duty form before she could return to work, Doc. #54-2 at 70-72, Barrett-Browning went on paid administrative leave, Doc. #54-1 at 15 (¶ 56).

Several months later, Barrett-Browning returned to work in September 2015 upon her submission of a fitness-for-duty form completed in part by a psychologist, *id.* at 14-15 (¶ 55), and in which she requested a post with ready access to a restroom, Doc. #54-3 at 9. She also asked her union representative to request a position with restroom access. Doc. #54-2 at 93-94.

Despite her requests, her supervising lieutenants assigned her to a new post every day, none of which provided ready access to a restroom and some of which required walking patrols. Doc. #54-3 at 8, 12-13; Doc. #54-2 at 89. Because she went stretches of two-to-three hours before she could be relieved, she "routinely" brought a change of clothes to work and "[s]ometimes" soiled her pants, Doc. #54-3 at 10, as occurred in September or October 2015 and in 2016, Doc. #54-1 at 10-11 (¶¶ 35-36), and allegedly on other dates that Barrett-Browning does not recall, Doc. #51-3 at 32. Even then, officers sometimes declined to relieve her because they were tired of doing so, were concerned about their supervisors' reactions because of how often they had to do so, or were simply unable to do so because they were called in a code. Doc. #54-3 at 24.

Also in 2015, Barrett-Browning became upset about gossip by staff. Doc. #54-1 at 15 (¶ 57). For example, she heard from another officer that Captain Newton set her up one time so that he could watch her soil herself on camera. Doc. #54-2 at 113-14. In 2016, Barrett-Browning filed an incident report complaining about the gossip and received no response. *Id.* at 115-16. In February 2016, she began seeing a therapist for mental health treatment. Doc. #54-1 at 14 (¶ 54).

Also in 2016, Barrett-Browning began to face abuse from Lieutenant Scott Fields. Doc. #54-2 at 82. She alleged that "almost . . . daily," he would call her a "scumbag," "loser," and "trash," ask her why she did not "drop dead," and tell her that "it was his job to get rid of [her]." Doc. #54-3 at 13. He also would "consistently" write her up for false violations and "regularly" throw the logbook in her face. *Ibid.*

In October 2018, when Barrett-Browning was attempting to resolve a dispute between two inmates, Lieutenant Fields allegedly "scream[ed]" at her and relieved her so she "could go spend time with the inmate by [herself]"—a comment she interpreted as sexual. *Id.* at 19. In November 2018, he further criticized Barrett-Browning when she allowed an inmate to leave the unit, calling her "a damn inmate lover" and "garbage." Doc. #54-1 at 16 (¶ 59).

In November or December 2018, Barrett-Browning lost vision in her left eye. *Id.* at 17 (¶ 63). In December 2018, she stopped working. *Ibid.* (¶¶ 65, 68). In January 2019, she applied for disability retirement. *Ibid.* (¶ 66).

During the entire course of her employment with the DOC, Barrett-Browning was never disciplined and received only excellent or above-average performance evaluations. *Id.* at 16 (¶¶ 61-62). Apart from Lieutenant Fields, the only other person whom Barrett-Browning could name as having mistreated her during that time was Captain Newton. *Ibid.* (¶ 60).

On October 19, 2018, Barrett-Browning filed this lawsuit alleging that the DOC and two other defendants violated the Rehabilitation Act of 1974, 29 U.S.C. § 701 *et seq.*, among other claims. Doc. #1. In July 2019, I dismissed all of her claims except the hostile-work-environment and failure-to-accommodate claims against the DOC under the Rehabilitation Act. *See Barrett-Browning v. Connecticut Dep't of Correction*, 2019 WL 3412173 (D. Conn. 2019). The DOC now moves for summary judgment on the remaining claims.

## DISCUSSION

The principles governing the review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The Rehabilitation Act provides for essentially equivalent protections against disability discrimination as the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*. *See* 29 U.S.C. § 794(d); *see also Hatch v. Brennan*, 792 F. App'x 875, 878 (2d Cir. 2019); *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).

In contrast to the ADA, however, a cause of action against the DOC for money damages under the Rehabilitation Act is not precluded by the Eleventh Amendment, because the State of Connecticut has waived its sovereign immunity by continued acceptance of federal funds under the Act. *See Super v. J. D'Amelia & Associates, LLC*, 2010 WL 3926887, at *12-13 (D. Conn.

2010); *see also Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 113-14 (2d Cir. 2001) (discussing basis for waiver of sovereign immunity under the Eleventh Amendment to apply differently to the Rehabilitation Act than to the ADA).

### *Hostile work environment*

In order to survive summary judgment on a claim of hostile work environment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); *see also Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387-90 (2d Cir. 2020) (discussing requirements for a claim of hostile work environment). For purposes of a claim of a disability-based hostile work environment under the Rehabilitation Act, a plaintiff must show that: (1) she suffered conduct that was objectively severe or pervasive enough to alter her employment conditions and create an abusive working environment; (2) she subjectively perceived the conduct as abusive; (3) there is a specific basis for imputing the conduct to her employer; and (4) the conduct occurred because of her disability. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019); *Jackson v. New York City Dep't of Educ.*, 768 F. App'x 16, 18 (2d Cir. 2019).

The DOC argues that that statute of limitations bars Barrett-Browning's hostile work environment claim. A three-year statute of limitations applies to disability-based discrimination claims under the Rehabilitation Act. *See Bond v. Connecticut Bd. of Nursing*, 622 F. App'x 43, 44 (2d Cir. 2015). It is well recognized, however, that a hostile work environment is inherently continuous in nature, and this continuity has implications for the application of a statute of limitations. "Because a hostile-work-environment claim by its nature is ordinarily comprised of a series of separate acts that collectively constitute a single unlawful employment practice, such

claims are timely if *any* act that is part of the hostile work environment falls within the limitations period, even if some of the acts relied on as a basis for the claim are independently untimely." *Pouncey v. Town of Hamden*, 2017 WL 5757740, at *6 (D. Conn. 2017) (citing *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134 (2d Cir. 2003)).

The DOC argues that the primary hostile act at issue—Captain Newton's reference to Barrett-Browning's incontinence bag—occurred in May 2015, which was more than three years before Barrett-Browning filed this lawsuit in October 2018. The DOC additionally argues that, even assuming Captain Newton's remarks could form the basis for a claim of a disability-based hostile work environment, there is no genuine issue of fact to show that any such disability-based hostile work environment continued into the limitations period (the three-year period from October 2015 to when the complaint was filed in October 2018).

I agree. Notwithstanding her complaints about abuse from Lieutenant Fields in 2016 and 2018, Barrett-Browning does not show that she was subject to intimidation, ridicule, or other abuse during the limitations period from October 2015 to October 2018 that was because of her incontinence disability. "A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999). The many abusive comments by Lieutenant Fields in 2016 and 2018 did not reference directly or implicitly her disability, and she does not point to any evidence to suggest that the abuse she suffered from Lieutenant Fields was at Captain Newton's behest or had anything to do with her disability.

Nor is there a genuine fact issue created by the fact that Barrett-Browning heard gossip from another officer that Captain Newton tried to set her up one time so that he could watch her soil herself on camera. This hearsay gossip is not properly admissible to attribute the alleged

8

conduct or discriminatory animus to Captain Newton or to the DOC more generally. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (court may not consider inadmissible hearsay to resolve motion for summary judgment).

At best, Barrett-Browning has adduced evidence that she was subject to a hostile and abusive working environment but not that she was subject to a *disability-based* hostile working environment within the statute of limitations period from October 2015 to October 2018. Accordingly, I will grant DOC's motion for summary judgment with respect to Barrett-Browning's claim of a hostile work environment for lack of a genuine issue of fact to show that Barrett-Browning was subject to a discriminatory hostile working environment during the applicable limitations period.

### *Failure to accommodate*

In order to establish a *prima facie* claim of failure to accommodate under the Rehabilitation Act, a plaintiff must show that: (1) she was disabled within the meaning of the Rehabilitation Act; (2) her employer is subject to the Rehabilitation Act and had notice of her disability; (3) she was otherwise qualified to perform the essential functions of her job, with reasonable accommodation; (4) her employer has refused to make such accommodations; and (5) the failure to accommodate, her performance deficiencies, and the adverse employment action were connected. *See Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019). If the plaintiff succeeds in meeting this initial burden, then the employer may counter by proffering a legitimate, nondiscriminatory reason for its action. *See Hodges v. Holder*, 547 F. App'x 6, 8 (2d Cir. 2013). And if the employer advances such a reason, the plaintiff may still succeed on her claim if she can show that the proffered reason was a "pretext" for discrimination. *Ibid.*

As an initial matter, the DOC argues that the failure-to-accommodate claim is barred by the three-year statute of limitations. Although I previously ruled that the complaint plausibly alleged facts sufficient to bring Barrett-Browning's claim within the three-year statute of limitations, *see Barrett-Browning*, 2019 WL 3412173, at *4, the summary judgment record shows that only once did Barrett-Browning request an accommodation by means of a doctor's note upon her return to employment in September 2015 at which time no accommodation was made. This request and alleged refusal occurred more than three years before the filing of the complaint on October 19, 2018.

Unlike a claim for a hostile work environment, a claim for a failure to accommodate a disability is not inherently continuous in nature for purposes of applying a statute of limitations. As the Second Circuit has explained, "[t]he rejection of a proposed accommodation is a single completed action when taken, quite unlike the series of separate acts that constitute a hostile work environment and collectively constitute an unlawful employment practice." *Elmenayer*, 318 F.3d at 135 (internal quotations omitted). "Although the *effect* of the employer's rejection continues to be felt by the employee for as long as he remains employed, that continued effect is similar to the continued effect of being denied a promotion or denied a transfer, denials that [the Supreme Court has] offered as examples of a discrete act." *Ibid.*; *see also Ross v. New York*, 2017 WL 354178, at *2 (S.D.N.Y. 2017) (claim for failure to accommodate disability not subject to continuing violation doctrine to extend statute of limitations); *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, 2014 WL 3867560, at *9 (E.D.N.Y. 2014) (Bianco, J.) (same). Thus, Barrett-Browning's failure-to-accommodate claim fully accrued for statute of limitations purposes more than three years before she filed this lawsuit in October 2018. *See Morse v. Univ. of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992) (explaining how federal law governs the accrual

date for a federal law disability claim even if the claim is subject to a state law statute of limitations).[1]

To be sure, Barrett-Browning contends that she made additional accommodation requests within the limitations period through her union representative. The record, however, shows only that she complained to her union representative, and there is no non-hearsay basis to conclude that the union representative in turn made requests to the DOC for accommodation and which were refused at any time within the three-year limitations period.

## CONCLUSION

For the reasons stated above, the Court GRANTS defendant's motion for summary judgment. Doc. #51. Because there is no genuine issue of fact to support a claim for hostile work environment or a claim for failure to accommodate within the statute of limitations period, it is not necessary to consider the additional arguments raised by the DOC or its arguments concerning spoliation of evidence. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 31st day of August 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[1] I am not persuaded that state law rules of equitable tolling should allow indefinite extension of the statute of limitations for a failure-to-accommodate claim for so long as an employer does not make an accommodation, *see, e.g.*, *Lee v. Dept. of Children and Families*, 939 F. Supp. 2d 160, 171 (D. Conn. 2013), because to so rule would mean as a practical matter that there is no statute of limitations that applies to a claim for failure to accommodate a disability.